## BLOCK *v.* COMMISSIONERS.

### COMMISSIONERS *v.* BLOCK.

1. A., the lawful holder of coupons detached from bonds issued by a county in Kansas, applied to a court of competent jurisdiction for a *mandamus* to compel the county commissioners to pay such of them as were then due, and levy a tax sufficient to pay those shortly thereafter falling due. The commissioners denied the validity of the bonds and the obligation of the county to pay them. Judgment was rendered for the defendants. Subsequently, A. delivered the same coupons to B., to be collected for the benefit of A. B. brought suit. *Held,* that the judgment was a bar to the suit.

2 The court again decides that a *bona fide* purchaser of municipal bonds for a valuable consideration, who had no actual notice of any defence which could be set up against them, is not bound to look further than to see that there was legislative authority for their issue, and that the officers who were thereunto authorized have decided that the precedent conditions upon which

it was allowed to be exercised have been fulfilled. If such authority was conferred and such a decision made, the bonds are valid obligations which he may enforce.

3. Where, pursuant to a statute entitled "An Act authorizing counties and cities to issue bonds to railroad companies," approved Feb. 10, 1865, as amended Feb. 26, 1866, an election was held in a county in Kansas upon the question of a county subscription to the capital stock of "any railroad company" then, or thereafter to be, organized which should construct a railroad from a point in Missouri to a point in the county, and the result having, May 8, 1867, been declared by the proper authorities to be in favor of the subscription, and so entered on their minutes, the bonds were, in 1870, issued in payment of the subscription to a Missouri company, which caused the road to be built, — *Held*, that the subscription was binding, and that the county, in an action on the bonds by such a purchaser, is estopped from asserting that in fact a majority of the qualified electors had not voted in favor of the issue of the bonds.

ERROR to the Circuit Court of the United States for the District of Kansas.

This was an action brought, March 17, 1875, by Block, against the board of commissioners of the county of Bourbon, Kansas, upon overdue coupons, amounting in the aggregate to $16,800, detached from bonds issued by that county.

A copy of one of the bonds and coupons is as follows: —

"No. —.]          STATE OF KANSAS.          [$1,000.

"*Stock Bond of Bourbon County.*

"Thirty years after date, the County of Bourbon promise to pay to the Tebo and Neosho Railroad Company, a corporation organized by authority of the laws of the State of Missouri, and by virtue of an act of incorporation passed by the legislature of the State aforesaid, and approved the sixteenth day of January, 1860, or bearer, the sum of one thousand dollars, for value received, with interest at the rate of seven per cent per annum, payable semi-annually, at the New York National Exchange Bank, in the city of New York, from and after the first day of January, 1871.

"City of Fort Scott, Kansas, July 1, 1870.

"By order of the board of county commissioners of the county of Bourbon, Kansas, dated March 8, 1867.

[SEAL.]                              "D. GARDNER,
          "*Chairman, Board of County Commissioners, Bourbon County.*
"Attest: C. FITCH, *Clerk.*"

                              "FORT SCOTT, KANSAS, July 1, 1870.

"Treasurer of Bourbon County will pay bearer thirty-five dollars, at the New York National Exchange Bank, in the city of New

York, being semi-annual interest due on the —— day of ——, 18—, on the bond of the county of Bourbon, No. ——, to the Tebo and Neosho Railroad Company, issued in pursuance of an order of the board of county commissioners of said county, dated March 8, 1867.

" D. GARDNER,

" *Chairman, Bourbon Board of County Commissioners.*

" C. FITCH, *County Clerk.*"

Under its charter, granted Jan. 16, 1860, the company had power to construct a road between certain points, and to extend and operate it or its branches beyond the limits of Missouri.   It transferred, in October, 1870, by authority of a statute of that State, its franchises, rights, and privileges, " including subscriptions," south of a designated point, to the Missouri, Kansas, and Texas Railway Company, a Kansas corporation.   The latter company assumed all indebtedness incurred for the construction or otherwise of the line between Sedalia, Mo., and Fort Scott, the county seat of said county, and constructed in due time the road through that county, *via* Fort Scott, to Texas.   The road is now in full operation.

The said board, March 8, 1867, adopted an order, which was duly entered on its minutes, as follows: —

"Be it ordered by the county commissioners of Bourbon County, Kansas, that there be subscribed, in the name and for the benefit of the county of Bourbon, in the State of Kansas, $150,000 to the capital stock of any railroad company now organized or that shall hereafter be organized that shall construct a railroad commencing at a point on the Tebo and Neosho Railroad, running westward *via* Fort Scott, and that the bonds of said county be issued to said company for the same, said bonds to be payable within thirty years from the date thereof, and bearing interest at the rate of seven (7) per centum per annum: *Provided,* that said bonds shall not be issued until the question shall have been submitted to a vote of the qualified electors of the county of Bourbon, and shall have received a majority of the votes cast in favor of the same, in pursuance of the provisions of an 'Act to authorize counties and cities to issue bonds to railroad companies,' approved Feb. 10, 1865; and that said question shall be submitted to said electors at a special election on the seventh day of May, A.D. 1867.

" At said election the votes shall be cast 'For railroad bonds,' and ' Against railroad bonds ; ' and if it shall appear, upon a canvass of said votes by the proper officers, according to law, that a majority of the votes cast are in favor of the said subscription, then the above order shall be carried into practical operation by the issuing of said bonds to said company whenever the county commissioners of Bourbon County are satisfied that the road-bed of the Tebo and Neosho Railroad is completed to such a point that the amount of said bonds shall be sufficient and adequate to construct the road-bed and connect the said point with the city of Fort Scott."

Said order was duly published, and the election held pursuant thereto. On canvassing the returns, the board declared, May 10, 1867, that there was a majority of twenty-six votes " for railroad bonds," and that there was no evidence that an election had been held in the township of Franklin.

The poll-book from that township did not arrive at the clerk's office until after the commissioners had adjourned.

The board, July 23, 1869, made a further order, providing for a special election on the twenty-fourth day of the following August. The election was duly held accordingly, and on canvassing the votes, the board declared that a majority of them had been cast in favor of the proposed subscription.

The board thereupon appointed an agent to subscribe, in the name and for the benefit of the county, $150,000 to the capital stock of said Tebo and Neosho Railroad Company, upon the express condition, " which was made a part of said subscription," that the county bonds should not be delivered to the company, nor the county become liable to pay any portion of its subscription, until the road-bed of the company should be completed to such a point that the amount of bonds should be sufficient to complete the road from Sedalia, Mo., to Fort Scott. There was a further condition that the subscription should be void unless the road-bed was completed to Fort Scott, Jan. 1, 1872.

The board, July 2, 1870, ordered that the bonds bearing date July 1, 1870, of the tenor and effect of the foregoing copy, be issued, and deposited with a certain person as trustee of the county, for delivery to the company when the condi-

tions upon which they had been voted should be complied with.

The board, Jan. 2, 1871, upon a report made to it, approved the delivery, on the fifth day of November, 1870, of the bonds to the company, the coupons covering interest from July 1 to Sept. 1, 1870, having been detached therefrom.

The board, June 27, 1872, ordered that the poll-book of Franklin Township of the election held May 7, 1867, which had remained sealed since it had been delivered by the messenger of the township, should be opened. The board declared, after inspecting said book, that if the vote then cast by that township had been computed in canvassing the county vote, the proposition to vote the bonds would have been rejected.

The board thereupon ordered the treasurer of the county to withhold the payment falling due on said bonds July 1, 1872, and to notify the New York National Exchange Bank of the City of New York, as the fiscal agent of the county, that no more interest would be paid on them, and that the principal would not be paid at maturity.

The county levied and collected taxes for 1870, 1871, and 1872, to pay interest on the bonds in suit, and paid the first three instalments of interest thereon.

Certain coupons, on which this suit was brought, numbered four, originally attached to said bonds, from one to one hundred, had been in controversy in a *mandamus* proceeding in the Supreme Court of Kansas, instituted by one Lewis, then and still the real and beneficial owner of them. They were in possession of Block for collection.

The remaining facts are stated in the opinion of this court. The Circuit Court gave judgment in favor of the county on the coupons in suit which were attached to the bonds numbered from one to one hundred, inclusive, and against it for the remaining coupons, being on bonds owned by Block, numbered one hundred and thirty-one to one hundred and fifty.

Each party sued out a writ of error.

*Mr. John D. Stevenson* for Block.

*Mr. J. E. McKeighan, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

These are writs of error complaining of one judgment. The plaintiff, Block, brought suit against the board of commissioners of the county of Bourbon, Kansas, to recover the amount of $16,800 alleged to be due him upon past-due interest coupons detached from bonds made and issued by that county. From the findings of fact made by the court below it appears that the plaintiff is the *bona fide* owner of twenty of the bonds from which part of the coupons in suit were taken, and that he purchased them in open market without actual notice of any defence the county now sets up against them. The remaining coupons are the property of one William J. Lewis, delivered by him to the plaintiff to be collected, not for the benefit of Block, but for that of Lewis, the true owner. Whether, in view of such a finding, a recovery for them can be had in this suit, if there were no other objection to it, we do not now determine. There is another and graver question to be considered. The Lewis coupons had been in litigation before this suit was commenced. In January, 1873, he applied to the Supreme Court of the State for a *mandamus*, suggesting that he was the owner of bonds of the county, one hundred in number, and numbered from one to one hundred, and of the coupons attached to the same; that he was the holder, bearer, and owner of the one hundred coupons due and payable July 1, 1872, part of the coupons now in suit; that a tax had been levied and collected amply sufficient to pay those coupons, but that the county had refused to pay them. The suggestion further represented that the proper officers of the county had neglected and refused to take the necessary steps to make provision for the payment of the coupons falling due in 1873, in January and July, and by an alternative writ the board of commissioners of the county were commanded to pay the coupons due in 1872, and to provide for levying a tax sufficient to pay the coupons as they should fall due in 1873.

To this alternative writ the commissioners answered, in substance, denying the validity and obligation of the bonds. Much of the answer was formal and quite immaterial, but there was also much of substance. It was denied that there had been any proper submission to the electors of the county of the ques-

tion whether the county should subscribe to the stock, or issue bonds to the railroad company to which the bonds were issued, to wit, the Tebo and Neosho Railroad Company. The answer further averred that, though there was a submission of the question to the electors whether the county would vote $150,000 to any railroad running east to connect with the aforesaid road, a majority of the votes cast at the election ordered was cast against the proposition. It further avers that though the commissioners canvassed the vote and decided from the returns before it that a majority had voted in favor of the proposition, the returns from one township were not brought in until after the canvass had been completed, and until after the board had adjourned, and that if the return from that township had been made in season and had been counted, a majority would have appeared against the proposition submitted. This belated return remained unopened until years afterwards, until after the bonds had been issued and after a new submission to the electors had resulted in the vote of a decided majority in favor of the bonds. This new submission, it was averred, was made in 1869, and it was not until after the vote had been taken that a subscription was made to the stock of the Tebo and Neosho Railroad Company, and the bonds of the county were issued in payment. At the time when the subscription was ordered to be made and the bonds were directed to be executed and delivered to the railroad company, it was also ordered that the stock of the county in the railroad company should be sold to the Land-Grant and Trust Company of New York, for the sum of five dollars.

Upon the issue thus tendered and made up the case was tried by the Supreme Court of the State, and a judgment was given for the defendant. What the effect of this judgment was has a most important bearing upon the inquiry whether there can be any recovery in the present suit for the coupons belonging to Lewis, the relator in the application for the *mandamus*.

To obtain a clear appreciation of that, it is necessary to observe closely what was in issue in the proceeding in the State court, and consequently what was adjudicated. It was not denied that Lewis was the owner of the one hundred bonds to which the coupons now in suit for his use were attached.

It was not denied that the coupons were due and unpaid, as averred in the suggestion and alternative writ. Nor was it denied that the officers of the county had power, and that it was their duty to levy a tax to pay them and to make payment, if they were a lawful debt of the county. In legal effect all this was admitted. The only issue tendered and the only issue tried was that tendered by the answer; namely, that the bonds and coupons were unauthorized by law, because a majority of the voters of the county, voting at the election in 1867, had not sanctioned a subscription to the stock of the railroad company, and approved the proposition submitted for the issue of the bonds. If they had not, the bonds were unauthorized, and the coupons, of course, constituted no debt of the county. Then the relator was not entitled to his *mandamus*. If, on the other hand, the bonds and coupons were lawfully issued, either in pursuance of the vote of 1867 or that of 1869, they did constitute a debt of the county, and a *mandamus* to enforce their payment necessarily followed. The court gave judgment for the defendant, as we have seen, and thus decided that the bonds and coupons held and owned by Lewis were invalid. Such was the necessary effect of the judgment. The issue tried was a material one, and the judgment could not have been rendered without deciding it. Now that a judgment in a suit between two parties is conclusive in any other suit between them, or their privies, of every matter that was decided therein, and that was essential to the decision made, is a doctrine too familiar to need citation of authorities in its support. A few cases go farther, and rule that it is conclusive of matters incidentally cognizable, if they were in fact decided. To this we do not assent. But it is certain that a judgment of a court of competent jurisdiction is everywhere conclusive evidence of every fact upon which it must necessarily have been founded. As between Lewis, therefore, and Bourbon County the judgment of the State Supreme Court finally established that the coupons which he held, and which he subsequently placed in the hands of Block, the plaintiff in the present suit, were invalid, and constituted no part of the debt of the county. As that judgment was pleaded in the present case, it was a conclusive answer to the suit so far as it was founded upon those

coupons. The plaintiff's writ of error, consequently, cannot be sustained.

The coupons held and owned by Block are in a different position. As between him and the county there is no estoppel. He was not party to the suit in which the Lewis coupons were adjudged invalid, and he is unaffected by the judgment therein. Of the coupons which he holds he is a *bona fide* holder, having purchased them for a valuable consideration, without actual notice of any defence which could be set up against them. When he bought he was under no obligation to look farther than to see that there was legislative authority for the issue of the bonds, and that the condition upon which it was allowed to be exercised had been fulfilled. If there was such authority, and the precedent conditions had been performed, the bonds and coupons are valid obligations of the county, which he, as their owner, may enforce.

The bonds are dated July 1, 1870, and on their face they purport to have been issued by order of the board of county commissioners of the county of Bourbon, Kansas, dated March 8, 1867, and they are made payable to the Tebo and Neosho Railroad Company or bearer.

The authority under which it is claimed they were issued was an act of the legislature of the State of Feb. 10, 1865, amended by an act passed Feb. 26, 1866. By that it was enacted " that the board of county commissioners of any county to, into, from, or near which, whether in this State or any other State, any railroad is or may be located, may subscribe to the capital stock of any such railroad corporation in the name and for the benefit of such county, not exceeding in amount the sum of $300,000 in any one corporation, and may issue the bonds of such county, in such amounts as they may deem best, in payment of said stock, . . . but no such bonds shall be issued until the question shall first be submitted to a vote of the qualified electors of the county at some general election, or at some special election to be called by the board of county commissioners, . . . and in submitting such question said board of directors shall direct in what manner the ballots shall be cast. If a majority of the votes cast at such election shall be in favor of issuing such bonds, the board of commissioners of the county shall issue the same."

In this act several things are to be noticed. The bonds were allowed to be issued in payment for subscriptions to stock of *any* railroad company, whether its road was then located, or might be thereafter, whether it *was in the State or out of it*, in the county or out of it, provided the question of subscription to the stock and issuing the bonds was first submitted to a vote of the qualified electors, and a majority was found in favor of issuing the bonds. Another thing is manifest. It was the legislative intention that the board of commissioners should be the body which should submit the question of subscription and issue of the bonds to popular decision, and they were also deputed to determine the result of the election, — we mean the board as it was constituted at the time when an election might be held.

Authorized by this statute, the board of county commissioners, on the 8th of March, 1867, submitted to the electors of the county the question whether there should be subscribed for the county $150,000 to the stock of any railroad company then organized, or that might thereafter be organized, that should construct a railroad commencincg at a point on the Tebo and Neosho Railroad running westward, *via* Fort Scott (in Bourbon County), and should issue bonds to the company for the same. Pursuant to this submission an election was held, the returns of which were canvassed at the proper time by the board, and the result declared to be that a majority of the votes had been cast in favor of the subscription and the issue of the bonds. This was on the 10th of May, 1867. The declaration of the result was duly entered upon the minutes of the board. Subsequently an additional return was made from one township which was not before the board when the canvass was made. Had it been, the result would have been different. But this return was not opened until June 27, 1872, long after the bonds had been issued. Upon the records of the board nothing appeared to impeach the canvass made in 1867, though in the files of the office the belated poll-book remained unopened. It is hardly necessary to say that the board, *as it was in* 1872, had no authority to make a new canvass of the election held in 1867, after the bonds had been issued and purchasers had bought on the faith of the canvass first made.

The bonds, it is true, contain no recitals. If they did contain a recital that an election had been held, and that a majority had voted for the issue of the bonds, the recital would have been conclusive upon the county, and a purchaser would have needed to look no farther than to the act of the legislature. This is according to all our decisions. But in the absence of any recital it may be conceded he was bound to inquire whether a majority vote had been returned for the issue of the bonds. But where was he to inquire? Plainly only of the board whose province it was to ascertain and declare the result of the election. Had he gone to their records, they would have shown that the popular vote was in favor of the bond issue. They showed nothing else until 1872. He was not bound to canvass the vote for himself, or to revise and correct a mistaken canvass, any more than he was bound to inquire into the qualification of the electors. And if, relying upon the canvass of the board and the declared result, he accepted the obligations of the county, it would be a strange doctrine were we to hold that a second canvass, made many years afterwards, could reverse the first and annul rights that had been acquired under it. There is no such law. For all legal purposes the result of an election is what it is declared to be by the authorized board of canvassers empowered to make the canvass at the time when the returns should be made, until their decision has been reversed by a superior power, and a reversal has no effect upon acts lawfully done prior to it. The county of Bourbon is therefore estopped, in a suit by a bondholder whose bonds were issued in 1870, from asserting that the canvass of 1867 was incorrect, and that in fact no majority of the qualified electors had voted in favor of the issue of the bonds. All that took place afterwards, all the new evidence that was discovered, the new election ordered and held in 1869, and the action of the board after the bonds were issued, are immaterial. It follows that much of the argument of the learned counsel for the county who has argued against the validity of the bonds and coupons is unsound. It assumes, what cannot be admitted, that a majority of the votes cast at the election in 1867 was against the issue of the bonds, when it was conclusively established by the decision of the tribunal appointed by law to

determine the result of the election, that the contrary was the fact.

We pass now to the consideration of some of the objections made to the order of the county board of March 8, 1867, submitting to the qualified electors the question whether there should be a subscription made to the stock of any railroad organized, or that might thereafter be organized, that should build a railroad commencing at a point on the Tebo and Neosho Railroad and running westward to Fort Scott, and whether county bonds should be issued to said company therefor. It is said this did not authorize a subscription to the stock of the Tebo and Neosho Railroad Company, or the issue of bonds to it. The objection, in view of the facts that appear in the record, is of no weight. When the order was made, that company had been incorporated by the legislature of Missouri, and had projected its road along and near the northern boundary of that State through a county adjoining Bourbon. The order of the county board contemplated a connection of Fort Scott with that road, and the issue of bonds to any company that would make that connection. A part of the connecting road was necessarily in Missouri and a part in Kansas. The Missouri corporation could only build, by its own direct action, to the State line, and a Kansas corporation could only build the part in Kansas; but the Tebo and Neosho Company could and did cause the entire line to be constructed. It had power by its charter to extend, construct, maintain, and operate its railroad and branches beyond the limits of the State, so far as Missouri could give it that power. In 1869, that company, under legislative authority, sold all its privileges, rights, powers, and franchises to the Missouri, Kansas, and Texas Railway Company, organized under the laws of Kansas, stipulating that the vendee should assume all indebtedness incurred for the construction, or otherwise, of the line between Sedalia, Mo., and Fort Scott (in Bourbon County, Kansas). Accordingly the road begun by the Tebo and Neosho Company was constructed and extended to and beyond Fort Scott, and is now in operation. There can be no doubt that this was a compliance by the Tebo and Neosho Company with the conditions prescribed by the order of the county board. It built the road

through the agency of the Kansas corporation, and it therefore answered the description made in the order of submission. The county commissioners subscribed to its stock and issued the bonds to it, or bearer, and their action was warranted, as we have said, by the terms of the submission and its approval. It was not a case of authority given to issue bonds to one railroad company, and their issue to another.

We have said enough in refutation of the argument that because the Tebo and Neosho Railroad Company was a Missouri corporation, and could not, therefore, extend its road into Kansas, it was excluded from the roads contemplated in the order and election. If it was, then every railroad company was excluded, for even a Kansas company could not build a road into Missouri. Yet the order and election meant something. No company was named in the order. None could be. But a description was given that pointed unmistakably to the company that caused the work to be done. In *Commissioners of Johnson County* v. *Thayer* (94 U. S. 631), this court held that under the Kansas statute of 1865 it is not necessary to name any particular company in the submission to the popular vote. A description of a railroad company may well be made without mentioning its corporate name.

This is all that, in our judgment, these cases require. We have not deemed it necessary to invoke in aid of our conclusions the provisions of the curative act of 1868, for we think it is not open to question that a majority of the qualified electors of the county approved the subscription that was made and the issue of the bonds. That was finally determined by the board, whose duty it was to canvass the result of the election and declare the result. Their decision has never been reversed by any competent authority, and it cannot be impeached collaterally. Nor do we place any reliance upon the second order made in 1869, and the election held thereunder, resulting in a large majority in favor of the subscription and issue of the bonds. The bonds stand on the order and vote of 1867, as determined by the canvassing board at that time.

Nor can we yield assent to the claim that the acts of 1865 and 1866 were repealed by the General Statutes of 1868. Certainly there was no express repeal, and we can discover no

necessary implication of a repeal. And it may be added, that the Supreme Court of the State seems to regard those acts as still in force. *Lewis* v. *The Commissioners* (12 Kan. 186) gives no intimation to the contrary, though the court had before it the questions we are now considering. In *Morris* v. *Morris County* (7 id. 576), decided in 1871, the court said: " The acts of 1865–66 have never been expressly repealed ; and if they have ever been impliedly repealed, all rights, power, and authority that had accrued under them prior to their repeal had at least been impliedly reserved." And again : " Whatever was done under the acts of 1865 and 1866, prior to the passage of the acts of 1868, continued in force the same as though the acts of 1868 had never been passed."

We have not overlooked the opinion delivered by the Supreme Court of the State in *Lewis* v. *The Commissioners, supra.* The judgment in the case was not given until after the bonds were issued, and after the rights of the holders thereof had become fixed. We are, therefore, at liberty to follow our own convictions of the law. To those expressed by the State court we cannot assent. They are not in harmony with many. rulings of this court made and repeated through a long series of years, and they are not such as in our opinion would administer substantial justice if applied to this case.

*Judgment affirmed.*


MR. JUSTICE CLIFFORD dissented from the opinion of the court in the first, and concurred in it in the second case.